High Court of Errors and Appeals. June 10, 1819.

*Ridgely's Notebook II, 414.*

**WILLIAM DOUGLASS' ADMINISTRATOR v. ROBERT STEVENS**

High Court of Errors and Appeals. June 11, 1819.

*Ridgely's Notebook II, 423.*

*Mr. Hall,* for plaintiff in error, states the case. 1 Del.Laws 81, that creditors in this state shall be paid before foreign creditors. The only question arises under Art. IV, s. 2, of the Constitution of the United States, by which "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." Citizen is used in contradistinction to aliens. The Constitution intended to secure to all citizens of the United States, that is, to the citizen of each state the privileges of citizens, but not the privileges [of] the citizens of the particular states. It means to secure the right which grows out of allegiance, and that the citizens of the several states shall in each state have the privileges of citizens of that state, in contradistinction to aliens. Federalist, Number 42.

*H. M. Ridgely* for defendant in error. This debt, if Stevens had lived in the state, would have been entitled to payment before the debt of Douglass. Stevens' debt was a bill under seal. Douglass' was a debt due upon a book account. 1 Del.Laws 81, the order of paying debts. Maryland and Delaware are now under one general government which has a power to regulate the rights, the privileges of the citizens. There would be no reason to distinguish in the Constitution between citizens and aliens, because a citizen of one state could not have in any manner been deemed an alien.

According to the construction contended for by plaintiff in error, an alien, an inhabitant of Delaware, would be preferred to a citizen of another state. The Constitution means to secure the same facilities in recovering debts, the same rights and securities and remedies for property to citizens of another state, as to the citizens of this state, but not the same political rights and privileges which arise from political compact, the allegiance due to the state, and the support to the state. Could the state pass a law to prevent a citizen of another state from suing in this state? Congress has power to regulate commerce among the several states, but if the debts of citizens of this state and of another state are put on a different footing how [can] Congress regulate it?

---

[The] Case. The plaintiff below, the defendant in error, was an inhabitant of the State of Maryland, and lived out of the state at the time of giving the bill obligatory upon which this suit was brought, and ever since has lived out of the state and at the time

of the trial lived out of the state. William S. Douglass, the intestate, on March 6, 1813, became bound by his bill obligatory to Robert Stevens, the plaintiff below, and defendant in error, in $330. William S. Douglass died intestate, and Walter Douglass, the plaintiff in error, became his administrator. The suit was brought on this bill obligatory against the administrator, Walter Douglass. William S. Douglass at the time of his death was indebted to Walter Douglass, his administrator, in a large sum of money on a book account. The defendant below to the action brought against him pleaded debts of superior and prior dignity.

The question is whether the debt due to Walter Douglass, an inhabitant of this state, on a book account, shall be preferred to a debt due to an inhabitant of Maryland, by bill. The plaintiff in error insisted [that it should].

———

Continued under a *curia advisare vult* from term to term until October 23, 1821, at an adjournment of this court, when judgment was rendered. The cause was heard before RIDGELY, CHANCELLOR, JOHNS, Chief Justice, and DAVIS and PAYNTER, Justices of the Supreme Court. PAYNTER, Justice, resigned his seat in the Autumn of 1820, and BATSON was appointed by Jacob Stout, Speaker of the Senate, exercising the office of Governor, to supply the vacancy. MR. BATSON was taken sick June, 1821, which prevented the Court at that time from giving judgment. It is not now (October, 1821) recollected why judgment was not pronounced at June, 1820.

The case was not argued again after MR. BATSON's appointment, but RIDGELY, CHANCELLOR, and JOHNS, Chief Justice, furnished him with their written arguments.

CHANCELLOR RIDGELY. William S. Douglas, the intestate, a citizen of the State of Delaware became bound by his bill obligatory, dated March 6, 1813, in the sum of $320, to be paid to Robert Stephens, a citizen of the State of Maryland. William S. Douglass was also indebted at the time of his death to Walter Douglass, his administrator, a citizen of this state, the plaintiff in this court, in a large sum of money, on a book account. Stephens brought a suit in the Court of Common Pleas on this bill, against Douglass, the administrator. To this action the defendant below pleaded debts of prior and superior dignity, and insisted that the Act of Assembly directing the priority of payment of debts within this government (1 Del.Laws 81) entitled him to retain his debt, in preference to Stephens, a creditor residing out

of this state. The following are the words of the Act of Assembly upon which he relied:

"That where [1] debts are due by any person[s] whatsoever to any the inhabitants of this government, in all courts within the same, priority of judgment and execution for debts due from any person whatsoever shall be allowed to the inhabitants of this government; and that no foreign debt shall be paid by any executor or administrator, till the debts due to the inhabitants of this government be first secured and paid, on penalty to pay the creditors of this government, as far as the assets in such executor's or administrator's hands would reach before such foreign debts were paid: Provided that the demand be made within six months after the death of such debtor; any law, act, custom or usage to the contrary hereof in any wise notwithstanding."

The plaintiff below, Stephens, on the other hand relied upon the provision in the second section of the same Act of Assembly, and on the second section of the fourth article of the Constitution of the United States, as entitling him to a recovery of his debt in preference to the inhabitants of the state, whose debts are of an inferior order. The Act prescribes the payment of debts of a deceased person by an executor or administrator as follows. First, funeral expenses. Secondly, debts due to the Crown, and to the Proprietary, now to the State. Thirdly, debts due by judgment obtained in the lifetime of the party deceased. Fourthly, debts due by recognizances and for rent. Fifthly, debts due by obligation. Sixthly, debts due by bill. Seventhly, servants and workmen's [2] wages. Eightly, accounts of merchants and others. The section of the Constitution referred to ordains, that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The sixth article declares that the "Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby; anything in the Constitution or laws of any state to the contrary notwithstanding."

The Court of Common Pleas rendered a judgment in favor of Stephens. To avoid that judgment is the object of this writ of error.

---

[1] Manuscript reads "where any debts"; "any" does not appear here in the Act.

[2] At this point, *Ridgely's Notebook II, 425*, the account of this case is interrupted; it is resumed at *III, 547*.

I shall consider this case on the broad question, whether the Constitution of the United States places a citizen of the State of Maryland on an equal footing with a citizen of this state, in the recovery of debts. If it does, the judgment of the Court of Common Pleas is right, and must be affirmed, for the Constitution of the United States is the supreme law of the land, and abrogates the laws of every state in the Union inconsistent with it. But if, on the other hand, the term citizen is only used in contradistinction to alien, and if the Constitution designed to secure to the citizens of other states, the mere right of citizenship, that is, that they shall not be deemed aliens, and to confer no other privileges, then the judgment is erroneous and should be reversed.

Before the Declaration of Independence, the colonists of Great Britain in America, and before and since, the subjects of the King of England in every part of the world, could, and can, acquire, inherit, and hold land in any of his dominions, as fully as an Englishman can in England. This doctrine was carried so far in *Calvin's Case* that after the union of the crowns of England and Scotland, in the person of James I of England, a Scotchman born after the union was adjudged to be a natural born subject of England, and entitled to the same remedies in the courts of England as an Englishman. And after the conquest of Ireland by Henry II, and the extension of the British laws to that country, those who were born in Ireland were not aliens to the realm of England. Even those who were born in Calais, from the reign of Edward III until it was lost in Queen Mary's time, were capable and inheritable to land in England. See *Calvin's Case,* 7 Co. 1.

Impressed with these established principles, the people of the United States associated in the year 1774 to resist the oppressive and unconstitutional pretensions of the British King and Parliament. They united and acted in concert, as one people. Far from being aliens to each other, they knew that they were practically, as well as legally, fellow citizens, holding lands by purchases and inheritance in the respective governments, and enjoying every right and privilege indiscriminately with the inhabitants, only as the same were curtailed in this state by this Statute. Indeed so far was this sentiment of community of interest carried, that the people of this state were often represented in their own legislature, and in Congress, by persons who resided in Pennsylvania. After the Declaration of Independence and the adoption of our Constitution of 1776, Mr. McKean, though resident in Philadelphia, was a member of our General Assembly, and General Dickinson of Jersey and Mr. [——] [3] of Philadelphia

---

[3] Blank in manuscript.

were at another time representatives of this state in the Congress of the United States. Mr. McKean actually signed the Articles of Confederation on behalf of this state, when he presided in the Supreme Court of Pennsylvania. 2 Del.Laws 645. 1 Dall. 32.

After the Declaration of Independence, and before the signing the Articles of Confederation, each state possibly had the power to declare the citizens of other states aliens, but such an exercise of power would have been viewed with a most suspicious unfriendly eye, and would have violated the great principles of our Union. The Articles of Confederation, however, sufficiently restrained any such attempt. In the fourth article it was agreed:

> "The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this Union,[4] the free inhabitants of each of these states—paupers, vagabonds and fugitives from justice excepted—shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each state shall have free ingress and regress to and from any other state, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions, as the inhabitants thereof, respectively, provided that such restrictions shall not extend so far as to prevent the removal of property imported into any state from [5] any other state, of which the owner is an inhabitant; provided also, that no imposition, duty, or restriction, shall be laid by any state on the property of the United States, or either of them."

This article operated in favor of persons not included within the expression or meaning of the present Constitution, if the words "free inhabitants" were intended, as I presume they were, to include all the inhabitants of a state, except slaves. They comprehend aliens, free negroes, and every possible description of persons not slaves, with the exception of paupers, vagabonds, and fugitives from justice, and enlarged the privileges and immunities of such free inhabitants, equal to the privileges and immunities of the citizens of a state.

Nay, the inhabitants of a state might have been entitled to greater privileges in another state than they could enjoy in their own, and to greater than the mere inhabitants themselves were entitled to in such other state. A state might have qualified the

---

[4] Manuscript reads "the people of the several states in this Union, that the free inhabitants"; the article reads as printed above.

[5] Manuscript reads "to."

citizenship of its own people, but not the citizenship of the inhabitants of a neighboring state, who chose to visit or reside in such state, and thus no state could have protected itself against any class of persons however worthless or pernicious they might have been to society, if they were tolerated in a neighboring state. A single state might have poured into other states all its miscreants merely because they were inhabitants; and, in fine, the population of the United States, in relation to foreigners and all kinds of free persons, would have been subject to the control of any particular state favorable to the reception of such persons. The present Constitution has wisely corrected this evil by vesting the right of naturalization exclusively in the United States, and by using the word "citizen" instead of "free inhabitants." There was another objection to this fourth article of the Confederation. After employing the most comprehensive words, "privileges and immunities," it descended into a detail of some of those privileges and immunities, and weakened the force of those terms by not including in the detail all the privileges and immunities they were designed to protect. Ingress and regress from one state to another, the privileges of trade and commerce, and the removal of property are the only privileges and immunities enumerated, although the words "privileges and immunities" comprehend all the rights, and all the methods of protecting those rights which belong to a person in a state of civil society, subject, to be sure, to some restrictions, but to such only as the welfare of society and the general good require.

It is most evident from a consideration of this article that the idea never was entertained that the people of one state could be taken to be aliens in another. The article was made the better to secure and perpetuate what then existed. It conferred no new right, but legalized and preserved such as were then fully enjoyed. It is true that the legislatures of the several states might have restricted the privileges previously possessed by the citizens of the other states, and they might have violently made the people aliens to each other, but from the date of the ratification of the Confederation, their power in this respect was completely limited, and without a dissolution of the Confederacy, inhabitance alone in one state entitled the inhabitants to all privileges and immunities of free citizens in the several states.

Thus stood our Union before the adoption of the present Constitution of the United States. The second section of the fourth article was designed, if we judge from the words of it, and from the whole scope of the Constitution, to restrain to a more definite class of persons the privileges and immunities secured to them, and to extend to the citizens of the several states, in each state,

all privileges and immunities of citizens, without implication or construction. The only apparent difficulty in this section arises from the want of a constitutional definition of the word "citizen." But by contemplating our manners, the laws enacted before and since the Revolution, the Constitution of the United States and the Statutes of Congress, the meaning of the word "citizen" is as clearly ascertained, as any other term or expression which comprehends several attributes or properties.

The word "citizen" imports the same as the word "freeman" in our old Acts of Assembly, and means every white man, who by birth or naturalization is or may be qualified to exercise and enjoy, under like circumstances, all the rights which any native-born white inhabitant of the state does or can enjoy. And every white man, born or naturalized in any other state, is such a citizen of such other state as to be entitled in this state to all the civil rights of citizenship, and by residence and other qualifications, to all the political rights.

See 1 Bl. Comm.Book 1, c. 1. When men entered into a state they yielded a part of their absolute rights or natural liberty, for political or civil liberty, which is no other than natural liberty restrained by human laws, so far as is necessary and expedient for the general advantage of the public. The right of enjoying and defending life and liberty, of acquiring and protecting reputation and property, and in general of attaining objects suitable to their condition, without injury to another, are the rights of a citizen and all men by nature have them. But unless some method had been provided to secure their actual enjoyment they would be in vain declared, claimed or asserted. There are, therefore, established certain other subordinate rights of the citizens, which serve principally as barriers to protect and maintain inviolate these great and primary rights. The preservation of these original rights includes the preservation of the subordinate rights, the privileges and immunities, which it was intended by the constitution of this state to preserve to its citizens, and by the Constitution of the United States to preserve in each state to the citizens of the other states for the protection of the primary rights before mentioned.

The right of enjoying and defending life consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and in resisting even to the commission of homicide, when such resistance is necessary to save one's own life. The right of enjoying and defending life, without the privilege of protecting it by all the means which the law, as well as nature in extreme cases, furnishes, would be illusory to the last degree. Therefore, this privilege belongs to us, and by the Con-

stitution of the United States to every other citizen of the United States in common with us.

And so as to the enjoyment and defense of liberty. To exercise this right every individual entitled to it must have the privilege of locomotion, of changing situation, or removing his person to whatsoever place his inclination may direct, without imprisonment or restraint, unless by due course of law. To secure this right more effectually, our Constitution, Article 1, Section 13, has declared that the privilege of *habeas corpus* shall not be suspended, unless when in cases of rebellion or invasion, the public safety may require it. But as our Constitution was established for the government of the people of this state, it might be contended that the legislature may limit its operation to its own citizens, and that the privilege may be withheld from citizens of another state. And certainly the argument would be as sound as to assert that the legislature may suspend the privilege of recovering a debt except on terms of inequality which amount to a prohibition in some instances.

The right of acquiring and protecting reputation and property includes all the privileges incident to such right. Property cannot be acquired and protected without the privilege of applying to courts of justice. No man can be his own arbiter. Our constitution has declared that "all courts shall be open, and every man for an injury done him in his reputation, person, moveable or immoveable possessions, shall have remedy by due course of law, without sale, denial or unreasonable delay or expense." This is the assertion of a general right, the right of all men, and it would be ineffectually declared, were not the redress of wrongs, and the means of enforcing contracts, by which property is acquired, secured and protected. The acquisition of property is effected by contract. A right to property, or the acquisition of property may be derived either from the act of another, or by virtue of some positive institution. When it is derived from another it is generally effected by contract, and it becomes the privilege of every citizen to apply to courts of justice to enforce contracts, or to obtain redress for their violation. It is a privilege which grows out of the right of acquiring property, and is as necessary to its preservation, as the air we breathe is to life. Suppose an horse is lent, and the borrower refuses to restore him, or suppose an horse to be wrongfully taken, the owner can have remedy by law only. By redressing the injury or wrong the property is protected. So if an horse is sold, and instead of receiving the price, the seller leaves the money in the hands of the purchaser, and takes a bond for its payment at a future day, the recovery of this money by a suit at law even-

tually protects the property. Contract may be traced back to the establishment of exclusive property by civil law, and as contract had its origin in property, so property, or at least property derived from another, now depends upon contract. An obligation is a contract, and it is one of the various methods by which property may be acquired, and therefore a citizen of another state may claim from the courts of this state the enforcement of his contracts, or satisfaction for their breach, precisely as the citizens of this state can, because it is the privilege of a citizen and is secured to him by the Constitution of the United States. This debt must take place according to the order of payment prescribed to executors and administrators, otherwise he will not enjoy in this state all privileges and immunities of citizens, for a common right must be enjoyed by all alike. If his obligation is postponed to a book account, and the obligation of a citizen of the state is preferred to such account, it is certain that he does not, cannot, enjoy all privileges of citizens, when they of this state are entitled to an equality according to the dignity of their debts.

To what purpose are all privileges and immunities reserved to the citizens of each state, in the several states, if a state can discriminate between its own citizens and the citizens of another state in the privileges of a citizen, and unless the same method to protect their property is allowed to them? If we may cut and carve, and limit and restrain other citizens in the exercise of our privileges as citizens, it is evident that they are not entitled to all privileges and immunities of citizens in this state. To recover a debt is a privilege, but unless he can recover it equally, or as freely as a citizen of this state, something is withheld, and he has not the privilege of a citizen in this state, unless indeed more than the privilege of a citizen is bestowed on our own citizens. In the great question on the suability of states, Mr. Jay, in his clear and luminous argument, said, "The citizens of America are equal as fellow citizens, and as joint-tenants in the sovereignty." 2 Dall. 472.

The clause in the Constitution is as general as words can make it, and the exception contended for would contradict, and do violence, not only to this section, but to the leading principles of a free and national government, one great object of which is to ensure justice equally to all. It establishes the faith and credit to be given to the public acts, records, and judicial proceedings of each state. It provides for the apprehension of fugitives from justice, from one state to another; and it secures to those entitled to the service or labor of another, such service or labor, even against the laws or regulations of a state into which such

laborer or servant may fly, and by this section the rights of every citizen in the United States are protected in each state, by securing to him in the several states all privileges and immunities of citizenship. Thus the system is completed, and most extraordinary would it be if a difference were made in the recovery of debts! If this second section of the fourth article is to be understood with an exception, it is strange that it was not mentioned.

The difficulty is to discover in what instance any privilege or immunity of a citizen of one state may be abridged in another. He may purchase and hold land by any of the several modes by which real estate may be acquired. He may take by descent, where the title is vested in him by the operation of law. He may obtain goods and chattels in all the forms and varieties peculiar to personal property. He may be an executor, administrator, or witness. He may prosecute every species of suit both at law and in equity, and in short, as to every civil right, I know of no difference between him and a citizen of the state, unless this Act of Assembly makes one. If this be an exception to this article of the Constitution of the United States, and the intention was only to prevent citizens of other states being declared aliens, the legislature might abolish all the rights, privileges, and immunities of the citizens of other states. They might forbid the recovery of debts upon any terms, the privilege of *habeas corpus* might be disallowed them, and they might be subjected to perpetual imprisonment. The descent of land might be regulated differently from the descent of land generally. Immunity from arrest in suitors and witnesses during their attendance on courts of justice might be withdrawn. Extraordinary and excessive taxes might be imposed upon the lands of non-residents, and all the ties by which we are united as one people, so far as they depend upon our own internal state government, might be dissolved. Why should the citizens of another state be made aliens as to the recovery of debts, and not to all other purposes? Thus indirectly might be done what it cannot be pretended the state could directly do.

The only reasonable construction to be given to this section is that of placing all citizens of the United States on the same footing, and extending to them a perfect equality in their rights, privileges and immunities. If one citizen has a privilege to which others are not entitled, then they are not entitled to all privileges and immunities of citizens in the several states, which is directly contrary to this provision. The legislature may certainly prescribe different grades for the payment of debts by executors and administrators, and in so doing no violation will be done

to the Constitution of the United States, because all persons having debts of the same grade will rank equally. But a distinction between persons, because one resides in Delaware and the other in Maryland, directly diminishes the privileges of the citizens of Maryland. Upon the most deliberate consideration of this question, I am of opinion that the citizens of another state, the white citizens I mean, may claim the civil rights, privileges and immunities of citizenship, in the same manner, and upon the same terms that citizens of this state are entitled to them under similar circumstances. In the payment of debts by an executor or administrator there can be no other distinction than according to the dignity of the debt. A citizen of Maryland may recover a debt due by obligation, or bill, in preference to a debt due to a citizen of this state on account, because the Constitution of the United States gives him the same privilege as is given to a citizen of this state.

As to political rights the citizens of this and of other states have equal privileges under like circumstances. If a citizen of Maryland, a white man, of the age of 21 years, shall have resided in this state two years next before a general election, and within that time paid a state or county tax, which shall have been assessed at least six months before the election, he is as fully an elector, in his proper county, as any citizen of the state. And so, with the same qualifications of age, freehold, property, residence, inhabitance, he may be elected Representative, Senator, or Governor. A citizen of Maryland can be appointed to no office within a county, but let him become an inhabitant therein one year, and qualify himself to vote for representatives, and he will be eligible in the same manner as a citizen of this state. In short, with the same qualifications, and under the like circumstances, every white man who is a citizen of another state is entitled to all the rights civil and political, and to all privileges and immunities of citizens of this state.

There is another view that may be taken of the first section of this Act of Assembly [1 Del.Laws 81]. The preference given is not confined to citizens only, but it comprehends the inhabitants generally, citizens and aliens. It places an alien, if he should be an inhabitant of this state, upon higher ground than any citizen of the United States who does not reside in this state. An alien, who never intends to become a citizen, has a preference given by this Act. This law was enacted in 1721. In the year 1682, and in 1700, Acts of Naturalization were passed, and according to the provision of those acts an alien could not become a freeman, one entitled to the rights, privileges, and im-

munities of natural born subjects, without naturalization. The exclusive right of naturalization is vested in the Congress of the United States, and no state can give an alien a right or privilege greater than the rights or privileges of citizens of the United States. If this could be done in one instance, it could in all, and in this way the exclusive right of naturalization would be indirectly impaired. This Act of Assembly has this effect. It gives privileges to aliens, inhabitants of the state, greater than to citizens of other states, and in this respect is inconsistent with the Constitution.

Upon the whole I am of opinion that this first section of the Act of the General Assembly entitled, "An Act directing the priority of payment of debts of persons dying within this government," is inconsistent with the Constitution of the United States, and therefore void, and that the judgment of the Court of Common Pleas should be affirmed.

I confine this opinion entirely to the first section of that Act. It possibly may be supposed to have some bearing on the first clause of the second section, which authorizes administrators appointed out of the state, to recover upon certain terms debts due to their intestates, but it is not my intention to express a sentiment upon that part of the Act. The clause directing the order of payment of debts by executors and administrators is not in any manner affected by the Constitution of the United States, and stands in full force. This clause is necessarily connected with this cause, and gives priority to Stephens, the plaintiff below, and to all other citizens of this and of other states, in the recovery of debts due by obligation, or bill, over or before accounts of merchants and others. Should any question of this kind arise between a citizen, or an inhabitant, of this state, and an inhabitant, not being a citizen, of another state the opinion here given would leave it uninfluenced by any thing here expressed. I have considered the case between citizens of this state and citizens of another state, and none other.

CHIEF JUSTICE JOHNS. The question in this case is whether the Act of Assembly giving a preference to state creditors, 1 Del.Laws 81, contravenes the Constitution of the United States, and is incompatible with it. By the second section of the fourth article of the Constitution of the United States the citizens of each state shall be entitled to all the privileges and immunities of the citizens in the several states. The words "privileges" and "immunities" are nearly synonymous. Privilege signifies a peculiar advantage, exemption, immunity. Immunity signifies exemption, privilege.

The privileges and immunities to be secured to all citizens of the United States are such only as belong to the citizens of the several states, which includes the whole United States; and must be understood to mean such privileges as should be common, or the same in every state, which seems to limit the operation in the clause in the Constitution to federal rules, and to be designed to restrict the powers of Congress as to legislation, so that no privilege or immunity should be granted to one citizen of the United States but such as should be common to all. It is not that the citizens in any state shall be entitled to all the privileges of citizens in each state; if it was, there would be more plausible ground to say that a citizen of Maryland should have the same privileges and rights in Delaware as a citizen of Delaware is entitled to. But suppose the design of this section of the Constitution to have been to restrict the powers of legislation by the state legislatures, it cannot be extended so far as that no peculiar advantage should be given by any state to its own citizens, but what must be extended to all citizens, in every state in the union, because the privileges secured are not such as are given to citizens in one or more states, by the state laws, but must be such as the citizens in the several states, that is, in all the states are entitled to.

The great object to be attained was to prevent a citizen in one state from being considered an alien in another state, to secure the right to acquire and hold real property. Our situation antecedent to the formation of the first general government in 1778 rendered such a provision necessary, and accordingly a similar clause was inserted in the Articles of Confederation then adopted, from which the second section of the fourth article of the Constitution of the United States was probably taken. The privileges and immunities etc. are not enumerated or described, but they are all privileges common in the Union, which certainly excludes those privileges which belong only to citizens of one or more states, and not in every other state. It is more easy to ascertain whether the municipal law of this state giving a preference to state creditors is a law incompatible with the privileges secured by the second section of the fourth article of the Constitution of the United States, than it is to define all the privileges and immunities which the section was intended to secure to the people of the United States, and this will be sufficient for the purpose of deciding the present case.

By the Constitution of the United States all power, jurisdiction, and rights of sovereignty, not granted by that instrument, or relinquished, are retained by the several states. Uniformity of laws in the states is contemplated only in two cases, on the

subject of bankruptcy and naturalization. The legislative powers of Congress defined in the eighth section of the first article do not interfere with, or abridge, the power of the states to make local regulations which are to operate within the state. The restrictive clauses in the tenth section of the first article of the Constitution of the United States, limiting the powers of the states, are confined to certain enumerated cases, none of which comprehend the subject of distribution of the assets of a deceased person's estate among his creditors. The local regulations in the states are variant. In Maryland, I believe, there is no priority given to bond creditors over simple contract creditors. In this state the former must be paid before the latter. It will not be contended that the second section of the fourth article of the Constitution of the United States repeals that part of our Act of Assembly which gives a preference to bond creditors. And the effect would be inequity to give it such an operation as to repeal another part of the same Act which gives a preference to state creditors, for then a Maryland bond creditor might take the whole assets and exclude simple contract creditors residing in Delaware.

But it is to be ascertained whether the Act of Assembly is incompatible with the second section of the fourth article of the Constitution of the United States, and this must depend on the question whether the right to recover debts out of assets in the hands of an executor or administrator is a privilege intended to be secured by this section. And I am of opinion that the privileges designed to be secured cannot be construed to be any right which a creditor has to recover a debt from the administrator of a deceased person. This must depend on the laws of each state. It is neither a right nor a privilege, which, according to the words of the section, the citizens of each state are entitled to in the several states.

There is no rule as to the distribution of assets which is the same in all the states; nor is this a subject for Congress to legislate on, and the rules can only be made by the state legislatures. If the Maryland creditor has the privilege of commencing and prosecuting a suit for the recovery of his debt, to be regulated by the municipal laws of this state, he enjoys a privilege which this article intended to secure to him. The *lex loci* must govern as to the distribution of the fund for payment of debts. To recognize the principle on which the incompatibility is attempted to be supported will abridge the powers of the states to legislate on many subjects not contemplated by the Constitution. The extent of the operation of the principle to repeal state laws, it will be difficult to ascertain, and would leave us without

rule in many cases. Laws of a similar nature in some of the states, such as the laws in Maryland and Massachusetts for payment of debts by tendering property at an appraised value, have been considered to be still in operation, and this has been sanctioned by Acts of Congress as to debts due to the United States. The attachment laws of Maryland under which the property of a citizen of a sister state may be seized and sold has been determined by the Court of Appeals in Maryland to be in force, and it has not been doubted but that our attachment law is yet in force. Our insolvent law excluding non-residents is considered to be in operation, and special Acts are sometimes passed to extend it to non-residents. And I may add our extant law, and the Virginia law preventing the sale of land for payment of debts.

It would be mischievous and produce much inconvenience to sanction this new rule as to the settlement of deceased's estates. Executors and administrators would be involved in difficulties. The practice has been to pay state debts in preference to debts due to non-residents, according to the Act of Assembly, and I am of opinion the Act is not repealed by the Constitution of the United States. The policy and liberality of its continuance must rest with the legislature. We can only say, *ita lex scripta est.* I am therefore of opinion the judgment in the court below is erroneous, and ought to be reversed.

Davis and Batson, Justices of the Supreme Court, concurred with Chief Justice Johns.

Judgment reversed.

The following is the form in which judgment was entered in this Court:

> June 17, 1818, this cause came to be heard in the presence of counsel on both sides, and the record and proceedings aforesaid being inspected and examined by the Court, and the assignment of errors and all and singular the premises being heard, and the matters being debated by counsel on both sides, the Court did continue the same under advisement from term to term until this day. And now to wit, on October 23, 1821, because it appears to the Court that there is manifest error in the record and proceedings aforesaid in this, to wit, that for the matter set forth in the second error assigned, the court below ought not to have rendered an absolute judgment in the case aforesaid, but a judgment of assets. It is therefore considered by the by the Court here, that the said Matthew Driver, adminis-Court here that the judgment aforesaid, for the error aforesaid, be reversed and annulled, and it is farther considered

trator as aforesaid, do recover against the said Walter Douglass, administrator as aforesaid, the said debt of $320, and $80 the damages assessed by the jury aforesaid for the detention of said debt together with the costs of suit, to be levied of the goods and chattels which were of the said William Douglass at the time of his death, which shall come to the hands of the said Walter Douglass, and be legally applicable to said debt and damages. And by the Court the record and proceedings aforesaid with the record in this Court are remanded to the court below.

NOTE. Stephens had died since this cause was brought into this Court, and Driver administered, and was made party in the cause. It was necessary to remand the record that Driver might proceed against any assets which should hereafter come into the hands of Douglass, the administrator.